Filed 10/28/22  In re Amir M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re AMIR M., JR., et al., Persons Coming Under the Juvenile Court Law. | B313867 (Los Angeles County Super. Ct. No. 21CCJP01220B-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AMIR M.,<br><br>Defendant and Appellant. | |

APPEAL from findings of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Amir M. (father) appeals from the juvenile court's jurisdictional findings that he and S.E. (mother) engaged in domestic violence and that his history of substance abuse put his children, Amir M., Jr. (Amir, born June 2014) and Liam M. (Liam, born Sept. 2015), at substantial risk of harm. Because the juvenile court's jurisdictional findings are supported by substantial evidence, we affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

*Welfare and Institutions Code Section 300[2] Petition*

<u>Referral</u>

On January 28, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral

---

[1] On August 11, 2022, the juvenile court terminated jurisdiction in this matter. On August 22, 2022, father submitted a letter brief asserting that the juvenile court's order terminating jurisdiction did not moot the instant appeal. We agree and thus address the merits of father's appeal. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.)

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

alleging that mother yelled at the children[3] and that the parents yelled at each other.  The caller reported that mother yelled at father in the backyard of their home to "'stop using that shit'" and father responded, "'It is just meth.'"  Mother reportedly cried "'all the time,'" and father easily became upset.  The children were not attending remote school, and their hygiene appeared "'off'" in that they did not look dressed up and their hair was not done, although the caller acknowledged that that could have been due to the COVID-19 pandemic.

DCFS visit to the home

On February 5, 2021, a DCFS children's social worker (CSW) interviewed the parents at their home.  The family was living with the children's paternal grandmother.  The parents denied the allegations in the referral, specifically father's use of methamphetamine.  Rather, they reported that mother and the children's paternal grandmother had yelled at father to stop smoking cigarettes.  The parents denied that their arguments had ever become physical.

*Interview with mother*

Mother reported having recently stayed with the maternal grandmother in Apple Valley for a week.

*Interview with the children*

The children denied any abuse or neglect.  They also denied being aware of the parents engaging in domestic violence or substance abuse.  However, Amir informed the CSW that father

---

[3]     The family includes three children:  Amir and Liam, who are the subjects of this appeal, and their older half-sister, Lily L. (Lily), who is not a subject of this appeal.

was "spying" on mother. He said that father secretly watched and listened to the CSW's interview with her.

*Interview with the paternal grandmother and paternal aunt*

The paternal grandmother reported that she yelled at father when he smoked cigarettes. She and the paternal aunt denied having any concerns that the children were abused or neglected or that the parents engaged in domestic violence.

Father's drug test

Father submitted to a drug test on February 8, 2021; the results were negative for all substances.

Interview with Lily's father

On February 12, 2021, the CSW interviewed Jaime L. (Jaime), Lily's father. He did not have any concerns about Lily. He did not ask Lily many questions about mother's home, but said that she had mentioned that mother and father argued. He denied any knowledge of mother or father using drugs or alcohol.

Father's call to the CSW

On February 12, 2021, father reported that the children and mother were staying in Apple Valley. He denied that he and mother were experiencing relationship issues, but he was concerned about the children because he did not know who was staying in the maternal grandmother's home. He asked the CSW to make an unannounced visit to the home.

CSW visits the maternal grandmother's home

The CSW visited the maternal grandmother's home on March 2, 2021. When she arrived, father called and asked her to call him after she completed the visit. Father denied that there was anything the CSW needed to know prior to entering the home.

4

*Interview with mother*

When the CSW walked to the front of the home, mother was pacing and on the telephone. She heard mother state, "'I'm not going to go through this blame anymore like it's my fault.'" Mother got off the telephone when the CSW greeted her. She permitted the CSW to assess the maternal grandmother's home.

The CSW then asked mother if there was something going on that she should be aware of. Mother cried and said that she had lied to the CSW during the initial interview because father was listening to them. Mother disclosed that father had been using methamphetamine on and off for approximately six years. She reported that he used it outside of the home and never in her or the children's presence. She said that father acted agitated and was easily triggered after he used the drug. Father admitted to mother that he had relapsed at least five times. Mother believed that he last used methamphetamine several months ago. She disclosed that the maternal grandmother and father's entire family were aware of father's methamphetamine use. Although he had participated in a drug rehabilitation program several years ago, he had relapsed. Mother reported that father blamed her for his relapses.

Mother had moved to Apple Valley several weeks prior to the CSW's initial visit because she believed that she and father needed a break. Mother was still trying to make her relationship with father work, but she felt that she was doing all the work. She had a hard time giving up the relationship because of the children. She said that father was a good parent and that the children were unaware of his substance abuse.

Mother further reported that she and father had engaged in arguments that included them pushing each other, but not in

the children's presence.  They usually argued at night when the children were asleep.

Mother said that she and the children resided with father after Amir's birth, but the parents fought a few months after they had moved in together.  She disclosed that father had grabbed her by her arms and that the maternal grandmother moved mother and the children back to Apple Valley when she became aware of the incident.  At the time, father's drug use seemed to worsen[4] and he entered a rehabilitation program.  Mother and the children moved back in with father in August 2019 because he appeared to be doing well.  But, mother wanted to move back to Apple Valley a few months ago and asked father to move to the area with her so he could avoid the people who gave him access to drugs.  He refused.

Mother also told the CSW that approximately three to four months ago, father had locked her in a room with him, pushed her onto a bed, and covered her mouth with his hand.  She said that Amir and Liam were in the kitchen and no one else was home.  Mother told the CSW that when she pushed father off her, he said he was sorry, claimed mother made him do things he did not want to do, and stated that he wanted to hang himself.  Mother said father cut a cord from a steam mop and hung it from a ceiling fan and around his neck.  Mother was able to cut the cord.  She did not believe father was really trying to harm himself; rather, she thought his behavior was "'more for show.'"  Mother was concerned about father's mental health and substance abuse.  His mistreatment of her had taken a toll on her

_____

[4]     According to mother, father began using methamphetamine after Amir's birth.

mental health. That said, she did not believe that father would ever intentionally harm the children.

Mother did not want to directly communicate with father. Prior to the CSW arriving at her home that day, she talked to the children's paternal aunt and arranged for her and father to communicate through paternal relatives. Mother had told father to not call her. Mother showed the CSW text messages in which father initially led her to believe they were going to spend time together as a family during the upcoming weekend but then stated he did not want a relationship with her. Mother sent father a video of her crying.

Mother was tired of the constant back and forth with father. She said father did not allow her to have a social life, friends, or social media. She reported that father searched for her on social media to ensure that she did not have a secret account. Mother said that if father wanted to pick up the children for visits, she would communicate with him via the maternal grandmother.

*Interview with the maternal grandmother*

The maternal grandmother described the parents' relationship as "'just crazy'" and reported that father did not think clearly and would keep mother up all night questioning her. She had been present in the paternal grandmother's home when mother and father physically fought. She moved mother and the children to her home the next day.

She said that the parents went back and forth after that. When mother moved back in with the maternal grandmother in August 2019, father began sneaking around and peeking into the maternal grandmother's windows.

Father had also called the maternal grandmother and described lewd dreams that he had involving mother and another male. He also called and claimed that he was experiencing chest pains but said that she did not care. Father also called mother late at night when mother was at the maternal grandmother's home and make lewd and odd comments. The maternal grandmother believed that father's behavior was related to drug use.

She reported that father's behavior had been concerning for seven years and that she had been trying to convince mother to leave him. She said that father had called mother three days ago and told her that he wanted to work out their problems and be a family. He convinced mother to take that weekend off work and go to Sequoia with him and the children, but then told mother not to call him, talk to him, or tell him that she loved him. His back-and-forth behavior caused mother to cry incessantly. The maternal grandmother was sure that father was using methamphetamine and said that mother was miserable when she was around him.

The maternal grandmother had seen father physically discipline Amir with a belt.

*Other comments concerning father*

Mother, the maternal grandmother, and Amir told the CSW that father made inappropriate statements to mother and a man selling ice cream. When the maternal grandmother asked father why he made the comments, he claimed not to have slept in four days because mother kept him up by whispering in his ear. He denied that he had misheard mother due to his drug use.

8

*Interview with Amir and Liam*

They reported feeling safe and denied being afraid of anyone. When asked if they wanted to see father, they answered in the affirmative.

CSW's call with father

The CSW spoke with father on March 2, 2021. He acknowledged using methamphetamine to deal with financial and work-related stress, but said that he had not used it since December 24, 2019. He denied ever using it in the children's presence or having been under the influence while caring for them. Father said he did not use the drug consistently, but that when he did, he used it every couple of months. There was a period of time several years ago during which he used it more often. Father reported the children and mother were living in Apple Valley at the time; since then, he completed a rehabilitation program and had been clean for a long time before relapsing. Father admitted that he had relapsed five times during the last five years.

Father denied physically or emotionally abusing mother. He also denied ever acting erratically or showing anger in front of the children. He and mother had verbally argued and yelled in front of the children, but they had never hit each other or been aggressive. Father reported that mother had put her hands on him, but denied ever putting his hands on her. Father said that on one or two occasions, mother told him, "'I'm going to kick your ass.'" He said that mother had also slapped his chest.

Father initially denied having questioned Amir's paternity, but then said that mother once told him the child was not his. Father reported that he and mother had not lived together for more than a year and a half at a time. When asked about the

9

incident involving the cord and the ceiling lamp, father said that he was not using methamphetamine. He reported that he covered mother's mouth because she was yelling and told him that she hated him and wished he were dead. Father denied pushing mother onto a bed or holding her down. He said that he had asked mother during the incident if she wanted him to cut the cord and hang himself. He denied wrapping the cord around his neck or on a ceiling fan.

The CSW asked father about the incident involving the ice cream man. He said that he made a comment as a joke because he was upset that mother had accused him of cheating on her and being interested in another woman.

Father's visit with the children

At a visit in March 2021, the children reportedly had a "great" visit with father.

Father fails to drug test; order removing Amir and Liam from father

Following father's visit with the children, the CSW asked father to drug test the next day. Father said that he was willing to drug test, but that he had a busy work day. He said he would do his best to confirm a day and time for testing. The CSW informed father that DCFS would be seeking an order from the juvenile court authorizing it to remove his children from him.

On March 12, 2021, the juvenile court signed an order authorizing DCFS to remove Amir and Liam from father. When the CSW informed father of the removal order, he told the CSW that mother was abusive towards the children and said he had a video recording of mother yelling at them. Father would not share the recording with the CSW because he said that mother would respond by trying to "play the victim." Father felt the CSW

10

was biased and unprofessional.  He planned to share the recording with his attorney.

Mother denied that father had video of her yelling or speaking badly to father in front of the children.  She cried and said she had feared father would say something bad about her.

CSW's call with the paternal grandmother

The CSW spoke with the paternal grandmother on March 15, 2021.  She was concerned about mother's mental health and referenced a video recording of mother yelling and throwing a tantrum.  She said that she would speak with father about the CSW's request to view the video.

The paternal grandmother did not have any concerns about the children's safety with father.  Although father had a history of substance use, she was not aware of any recent use.  She believed that mother might have mental health issues and denied ever witnessing father put his hands on her.  The paternal grandmother was previously scared to talk to the CSW in front of the parents, especially mother.

*Filing of the section 300 petition*

On March 16, 2021, DCFS filed a section 300 petition alleging that the children were at risk due to the parents engaging in domestic violence and father having a history of substance abuse and being a current abuser of methamphetamine.[5]

---

[5] The petition further alleged that father had mental and emotional problems, including suicidal ideation.  Because the juvenile court dismissed that count at the jurisdiction hearing, we do not address it.

*Detention Hearing*

On March 19, 2021, the juvenile court detained Amir and Liam from father's custody and ordered that his visits with them be monitored. The children were to remain in mother's custody.

*Jurisdiction/Disposition Report*

Interview with Lily

Lily informed the dependency investigator (DI) that father, father's sister, and father's nephew were nice to her and her brothers. She had heard mother and father argue and yell in their room, but she could not understand what they were saying because the door was closed. While the yelling made her feel a little uncomfortable, she was not scared. In fact, Lily was not scared of father and described him as "nice."

Lily had never seen drugs and did not know what they were. Her parents told her drugs were bad and that was all she knew about them. She had never seen anyone use drugs or alcohol. She had never seen anyone stumble or act different or strange. Lily told the DI, "'I don't know if [father] uses drugs. He is really nice. Drugs are for bad people and [father] is not a bad person.'"

Attempted interview with Amir and Liam

The DI was unable to interview Amir and Liam because they were unable to focus on the DI's questions.

Interview with mother

Mother reported she and father had argued and that things got somewhat physical three to four times. Mother and father began experiencing problems after Amir's birth. She told the CSW, "'I think I had post-partum so we really didn't live together much.'" She denied any ongoing violence. In fact, mother said that father was not a violent person and did not actually ever hit

12

her.  Mother reported, "'It was more like him holding me.'"  Mother said that they mainly had verbal arguments.

But, mother also reported:  "'About [seven] years ago, [father] . . . hit me on my leg but it was more like he pushed my leg.  I don't remember what we argued about.  I didn't have any marks or bruises.'"  Also, in August or September 2020, she and father argued and father pushed her onto their bed and covered her mouth with his hand so that she would be quiet.  She said that father did not hold her mouth for too long and that he was not trying to hurt her.  Rather, she was very upset and father just wanted her to be quiet.

Mother said that father was also very upset and told her that he was going to hurt himself because he did not want to harm her.  Father reportedly wrapped a cord around his neck, but mother cut it so he did not use it again.  Mother said that father did not tie the cord tight, he just held it around his neck.  Mother added, "'I know that I can start arguments but he [tries] to keep arguing and sometimes, I'm just done.'"

Regarding the children, mother told the DI, "'The kids love their dad.  They always ask about him and they ask if he can come see them so that they can hug and kiss him.'"

Mother told the DI that she and father moved to the paternal grandmother's home so father could be closer to his work.  She was "'stressed out'" at the paternal grandmother's home because they had different customs.  The pandemic worsened the situation and took a toll on everyone.  Mother gave up on having the children attend school because the boys could not sit in front of a computer for long periods of time.  Father did not come home a few times, and mother went to the maternal grandmother's home the last time this occurred.  Mother said

13

that the maternal grandmother had a bigger home and that she and the maternal grandmother were able to assist each other.

Mother wanted her and father to be better parents and said that she was slowly coming to terms with them no longer being a couple. Mother believed that she and the children were better off and happier at the maternal grandmother's home.

Father was more authoritative than she was, and the children had always been well-behaved with him. Father was also loving towards the children.

Mother and father initially did not talk because he was told to not talk to her. They were now talking about the children and trying to fix their relationship. Father spoke with the children daily and mother wanted to work with him so he could be around the children. Mother believed that she and father worked better separated. She was still trying to accept that their relationship was over.

Mother did not know much about father's drug use because she had not been around it. However, she knew that he participated in a rehabilitation program and had relapsed a few times. Mother said that father reported last using methamphetamine in 2019 when she and the children were not living with him. She could not say that she had ever seen father on drugs, but stated that she knew something was different. Father seemed irritable and distant and she believed this caused them to argue. Mother did not trust father at the time. Mother was sure that father's family knew that he was abusing drugs before she knew. But, she did not believe that father was using drugs anymore. She believed that this case was a wake-up call for father. She did not believe he would use drugs again. Mother

said father only smoked cigarettes and that she told him to stop smoking them because she could not stand the smell.

Interview with Jaime

Jaime told the DI that Lily had informed him that mother and father argued, but she was happy when she was with mother.  Lily had never mentioned anything negative about father.  Jamie had spoken to father a few times and said he seemed like a great guy.  He did not have much to say about him.  Jamie was surprised to hear that father used drugs.  He said that father did not look like he used drugs and that he had never suspected it.  Lily never mentioned anything to him.

Interview with father

Father told the DI that he and mother argued but that he did not put his hands on her.  Father put his finger on mother's lips and told her, "'Please stop fucking yelling.  The kids [will] hear[.]'"  Father denied that they ever pushed each other.

Father wished mother the best and said that he understood that she was out of her element at the paternal grandmother's home.  He wanted to be as transparent as possible, but said they were not bad parents and that he never touched mother.  Mother's actions and the case confirmed for father that they were better off separated.  He said that he would love and appreciate mother as the mother of his children and that he would continue to support her and the children.

Father acknowledged drug use, but said that he had "'cleaned up [his] act a long time ago.'"  He told the DI that he wanted to be transparent but did not want to incriminate himself.  He reported that he had not used drugs recently and was not a current user or an addict.  He said that he would drug

15

test for the courts forever if that was what it took for him to have his boys.

Father was very hurt that he could not see his children like he had before and believed it was due to mother being upset that he had left her. Father reported that mother was a great mother and recently realized that her anger took over. Father said that they had to prove that they were great parents and they believed they were because they had great children.

Father's drug tests

Father tested negative for drugs nine times between February 28, 2021, and May 11, 2021. He missed tests on March 31, 2021, April 15, 2021, May 4, 2021, and May 7, 2021. DCFS reported, "The father's no shows have been excused and have been made up."

Father's visits with Amir and Liam

Father was visiting the boys on Sundays. The visits were nine hours in duration and the paternal grandmother monitored them. The family did not have any concerns regarding the visits. Mother reported the boys were happy and appeared well-cared for when they returned from the visits. The boys were exhausted from having so much fun. Father called the boys daily before bedtime.

Amir's and Liam's health assessments

The boys had mental health assessments on May 11, 2021. Amir was diagnosed with a speech disorder and oppositional defiance disorder. Mother reported the child was extremely active and required a lot of redirection. Liam was diagnosed with "'unspecified Defiant Disorder, Disruption of family and child affected by parental relationship.'" Mother reported that he

16

required redirection and had expressed sadness due to not seeing his father as often as he previously did.

DCFS recommendation

DCFS was concerned about the parents' transparency and believed that the parents were in denial and minimizing the domestic violence. DCFS also did not believe that father had been fully forthcoming with respect to his methamphetamine abuse. It believed that mother's description of father's recent behavior was consistent with substance abuse and that his substance abuse was therefore more recent than reported. DCFS reported the boys had behavioral problems, were at an impressionable age, and had been affected by father's behavioral changes due to his substance abuse.

Thus, DCFS recommended that the juvenile court sustain the section 300 petition, declare the children dependents of the court, maintain the boys in mother's custody, and order that father's visits with the boys be monitored. DCFS further recommended that the court order it to provide mother with family maintenance services and father with enhancement services.

*Last Minute Information for the Court*

On June 29, 2021, DCFS reported that father was participating in a 10-week parenting program. He had attended eight sessions and missed two. Make-up sessions were available. Father drug tested four additional times, and his tests were negative.

Mother and the children continued to reside with the maternal grandmother, and the children's needs were being met. Mother was participating in individual counseling and a

17

parenting program and was in agreement with continued DCFS and court supervision.

*Jurisdiction/Disposition Hearing*

The juvenile court conducted the combined jurisdiction/disposition hearing on June 29, 2021, and July 2, 2021.

After receiving the DCFS reports into evidence, the juvenile court accepted stipulated testimony offered by father's counsel. The stipulated testimony was as follows: "[Father] went to [*sic*] testing site on May 5th, 2021, and was told his letter was not called. [Father] went to the testing site on Friday, May 7, 2021, at 5:46 p.m., but the site had already closed. At that time father had not been aware or informed that the facility closed an hour and a half early on Fridays."

Then the juvenile court entertained argument. The children's counsel "submit[ted] on the court's tentative" to sustain the domestic violence count pled pursuant to subdivision (b)(1).[6] Counsel thereafter asked the juvenile court to sustain the count alleging father's substance abuse, but to amend it by removing the language alleging that father was a current abuser of methamphetamine and that mother failed to protect the children. With respect to disposition, the children's attorney asked the juvenile court to make a home-of-parents order on the condition that father continue to live with the paternal grandmother, the parents not visit together, and father participate in individual counseling to address domestic violence and healthy coparenting.

---

[6] It appears that the juvenile court first informed counsel of its tentative ruling off the record.

Mother's counsel joined with the children's counsel's arguments. She additionally asked the juvenile court to amend the domestic violence counts pled pursuant to section 300, subdivision (b)(1), by removing the language alleging that mother struck father's face with her fist. Mother's counsel told the juvenile court that mother was "submitting as to disposition" and was in agreement with a home-of-parents order if the juvenile court was inclined to grant it.

The juvenile court held a discussion off-the-record. When the matter went back on the record, the juvenile court told father's counsel that its tentative from the very beginning was to sustain the domestic violence count pled pursuant to subdivision (b)(1). It was also inclined to make mother nonoffending in the counts alleging father's substance abuse and concerning his mental health and did not have a problem modifying the count alleging domestic violence by removing the language alleging that mother punched father's face. The juvenile court was inclined to sustain the count concerning father's substance abuse, but was not opposed to striking the language alleging that father was a current abuser of methamphetamine.

In response, father's counsel asked the juvenile court to dismiss the section 300 petition in its entirety. If the juvenile court sustained any of the counts in the petition, father's counsel asked that the juvenile court make a home-of-parent order on the condition that father reside with the paternal grandmother.

Counsel for DCFS asked the juvenile court to sustain the section 300 petition as pled. During argument, counsel for DCFS said that there was a strong, underlying dynamic of power and control in the case.

19

The juvenile court agreed that the case involved a serious dynamic of power and control. It commented that although mother had punched father, it saw mother as a victim. It believed that father was an aggressor and said that it was striking the language alleging mother stuck father's face with her fist. Regarding father's substance abuse, the juvenile court struck the language alleging that father was a current user of methamphetamine because he had been testing negative for drugs. It amended the language to document that father had a history of substance abuse.

The juvenile court dismissed the count concerning father's mental health. It believed that father's paranoid behavior (including spying) was fueled by his methamphetamine use.

Ultimately, the juvenile court sustained counts b-1 and b-2 as modified, declared the children dependents of the court, maintained Lily in her parents' custody and Amir and Liam in mother's custody, removed Amir and Liam from father's custody, and ordered that father's visits with Amir and Liam be monitored.

*Notice of Appeal*

Father's timely appeal from the juvenile court's jurisdictional findings ensued.

## DISCUSSION

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244, overruled in part by *Conservatorship of O.B.*, *supra*, at p. 1010, fn. 7.) Substantial evidence is evidence

20

that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B.*, *supra*, at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

II. *Relevant law*

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [his or her] parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; see also *In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21–22.)

Although section 300 requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re J.N.* (2021) 62 Cal.App.5th 767, 775), the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.

21

(*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.)  "[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection.  [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.]  'Facts supporting allegations that a child is one described by section 300 are cumulative.'  [Citation.]  Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'  [Citation.]"  (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

III.  *Analysis*

    A.  <u>Domestic violence (count b-1)</u>

        1.  *Relevant law*

"[D]omestic violence in the same household where children are living is neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.  Such neglect *causes* the risk."  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; see also *In re Basilio T.* (1992) 4 Cal.App.4th 155, 169.)  "'Both common sense and expert opinion indicate [that] spousal abuse is detrimental to children.'  [Citations.]"  (*In re E.B., supra,* 184 Cal.App.4th at p. 576.)  It is a form of secondary abuse; children are affected by what happens around them as well as by direct harm.  (*In re Heather A.*, *supra*, at p. 195, fn. 11; see also *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562; *In re E.B.*, *supra*, at p. 576.)

        2.  *Analysis*

In challenging the juvenile court's findings with respect to count b-1, father argues that "the children were not directly harmed, they were not at risk of physical harm, the alleged domestic violence was not ongoing, and the allegations of past

domestic violence did not rise to the level contemplated by the law to support juvenile court jurisdiction." We are not convinced.

The evidence demonstrates that the parents' disputes had become physical several times throughout their relationship. Although the parents initially denied any violence in their relationship, mother later cried and told the CSW that she had not been honest during the first interview. Mother disclosed that their disputes had become physical. Mother explained she initially lied because father was listening in on the conversation. Her statement was consistent with Amir's report that father was "spying" on the CSW.

There was also evidence to support the juvenile court's belief that the violence seemed to be escalating. Mother reported that during the most recent incident, which occurred approximately three to four months before DCFS became involved, father locked her in a room with him, pushed her onto a bed, and covered her mouth with his hand. Mother disclosed that she punched father and that he tied a cord around his neck and a ceiling lamp.[7] Although mother later minimized her report, the juvenile court certainly could have found mother's earlier disclosure more credible, and it is well-settled that we defer to the juvenile court on questions of credibility. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600, fn. 5.)

Because the most recent incident, which was also the most serious, occurred three to four months before DCFS became involved, father is mistaken when he asserts that none of the violence "was anywhere near recent."

---

[7] Notably, father did not entirely deny that this incident occurred.

Although it is true the parents reported being separated at the time of the hearing, the evidence was that they had a history of having a tumultuous on-again-off-again relationship. Based on the parents' history, the juvenile court could have reasonably concluded that it was likely that the dynamics of their on-again-off-again relationship would continue, and that therefore, the risk remained.

The fact the children had not yet been physically harmed is not determinative. Amir and Liam were present in the home when the most recent altercation occurred. As set forth above, "[j]uvenile dependency law in general does not require a child to be actually harmed before [DCFS] and the courts may intervene." (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 383, fn. 3.)

Finally, the fact that there is case law that involved more serious and extensive violence does not undermine the juvenile court's findings in this matter.

B. Substance abuse (count b-2)

1. *Relevant law*

Under section 300, subdivision (b)(1), a juvenile court may exert dependency jurisdiction if, as pertinent here, a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" due to (1) "the failure or inability of [his] parent . . . to adequately supervise or protect" him, or (2) "the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1).)

Section 300 does not define the term "substance abuse," and courts have applied various standards in an effort to formulate a workable definition. The court in *In re Drake M.* (2012) 211 Cal.App.4th 754, 765–766 held that a finding of

24

substance abuse must be based on a medical diagnosis or a determination that a person comes within one of the specific DSM-IV-TR[8] categories.  Other courts have been unwilling to accept the premise that a medical diagnosis or a determination that a person comes within one of the specific DSM-IV-TR categories is necessary to establish that the person is a current substance abuser.  (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 725.)

When the failure to supervise is based on drug abuse, courts employ a "tender years" presumption; under that presumption, a "finding of substance abuse is prima facie evidence of the inability of a parent . . . to provide regular care resulting in a substantial risk of physical harm."  (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 766–777; accord, *In re Kadence P.*, *supra*, 241 Cal.App.4th at p. 1385; *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1220.)  In such cases, jurisdiction is appropriate even without proof of "an identified, specific hazard in the child's environment."  (*In re Drake M.*, *supra*, at pp. 766–767, italics omitted.)  What is more, risk of harm means just that: The juvenile court "need not wait until a child is seriously abused or injured to assume jurisdiction." *(In re Kadence P.*, *supra*, at p. 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

---

[8]     American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. rev. 2000).

2. <u>Analysis</u>

Substantial evidence supports the juvenile court's determination that Amir and Liam face "substantial risk [of] serious physical harm" as a result of father's substance abuse. (§ 300, subd. (b)(1).) It is undisputed that father has a history of substance abuse. And his drug abuse has caused him to engage in disturbing behavior, such as peeking into the windows of the maternal grandmother's home, making lewd calls to the maternal grandmother, and threatening self-harm during a dispute with mother. Significantly, mother reported that father seemed irritable and distant when he used methamphetamine, and she believed that his drug use caused them to argue. The fact that mother tied father's methamphetamine use to the couple's disputes is significant because, as set forth above, those disputes had become physical.

While father may have tested negative during these proceedings,[9] there is also evidence that father has relapsed multiple times. In fact, mother told DCFS that father had most recently used methamphetamine "several months ago." His recent use and repeated relapses gave the juvenile court "'reason beyond mere speculation to believe'" that his drug abuse would recur. (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) Given Liam

---

[9]     We reject father's contention that a medical diagnosis is a required element of proof to find substance abuse under section 300, subdivision (b). (*In re Rebecca C.*, *supra*, 228 Cal.App.4th at p. 725.)

26

and Amir's young ages,[10] the juvenile court justifiably found that they were at substantial risk of harm.[11]

## DISPOSITION

The juvenile court's jurisdictional findings are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

---

[10]    In *In re Christopher R.*, *supra*, 225 Cal.App.4th at page 1219, the Court of Appeal found that children six years old and younger were children of "'tender years'" to which the presumption applies.  But this is not a hard and fast rule.  Here, Amir was seven years old at the time of the jurisdiction/disposition hearing.  In light of the evidence that Amir was not mature enough for the DI to interview and mother's report that he was extremely active and required a lot of redirection, coupled with his diagnosis of oppositional defiance disorder, the trial court justifiably determined that he required close supervision and was at an increased risk of harm in the event his care was inadequate.

[11]    The fact that father "had no recurrent substance-related legal problems" is irrelevant.

27